25CA2486 Peo in Interest of MLJ 07-30-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA2486
City and County of Denver Juvenile Court No. 23JV30972
Honorable Laurie Clark, Judge

The People of the State of Colorado,

Appellee,

In the Interest of M.L.J., a Child,

and Concerning A.L.R.H. and A.T.K.J.,

Appellants.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHOCK
Welling and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 30, 2026

Miko Brown, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Harald Van Gaasbeek, Office of Respondent Parents' Counsel, Fort Collins, Colorado, for Appellant A.L.R.H.

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant A.T.K.J.

¶ 1    A.L.R.H. (mother) and A.T.K.J. (father) appeal the judgment terminating their parent-child legal relationships with M.L.J. (the child).  We affirm.

## I.    Background

¶ 2    Denver Human Services (the Department) filed a petition in dependency or neglect three weeks after the child was born based primarily on concerns about the parents' substance use.  Although mother tested negative for all substances after the child's birth, she admitted to using methamphetamine during her pregnancy and reported a twelve-year history of methamphetamine use.  Father tested positive for methamphetamine and fentanyl.  The child initially remained in mother's care with the Department's support, while the Department further assessed her current substance use.

¶ 3    Two months later, mother tested positive for methamphetamine and other substances, and the juvenile court granted temporary custody of the child to the Department.  The Department placed the child with his paternal step-grandmother, where he remained for more than a year, until the grandmother's death four months before the termination hearing.  The child was then placed with his paternal great-uncle for the rest of the case.

¶ 4 The parents entered no-fault admissions to the petition, and the juvenile court adjudicated the child dependent and neglected and adopted treatment plans for the parents. Nearly a year later, the Department moved to terminate mother's and father's parental rights. After a three-day evidentiary hearing, two years after the petition was filed, the juvenile court granted the motion and terminated mother's and father's legal relationships with the child.

## II. Termination Criteria and Standard of Review

¶ 5 The juvenile court may terminate a parent-child legal relationship if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan, or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 6 Whether the juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15; *see also People in Interest of A.S.L.*, 2022 COA 146, ¶ 8 (applying the same standard of review to whether a department of human services satisfied its obligation to make

reasonable efforts). We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. The credibility of witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn therefrom are within the discretion of the juvenile court. *A.M.*, ¶ 15.

### III. Reasonable Accommodations — Mother

¶ 7 Mother contends that the juvenile court erred by concluding that the Department made reasonable efforts to rehabilitate her and reunite her with the child because it did not reasonably accommodate her disabilities under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213. We disagree.

### A. Additional Background

¶ 8 Before the dispositional hearing, the Department explained in its report to the juvenile court that mother was partially paralyzed on her left side due to a stroke, had been diagnosed with a traumatic brain injury (TBI), and had a developmental disability.

¶ 9 The Department therefore proposed that mother be required, as part of the treatment plan, to complete a cognitive evaluation to "provid[e] the team [with] more tools and recommendations" to aid

professionals in providing services. The treatment plan, adopted by the court with mother's agreement, required mother to engage in a cognitive evaluation and follow all recommendations, work with the Department to create a therapeutic treatment plan, work with a life skills worker, attend medical appointments "as needed to address her ongoing medical conditions," follow the recommendations of medical treatment providers, and take all prescribed medication.

¶ 10     Shortly after the dispositional order adopting the treatment plan, mother's counsel moved to withdraw, citing an irretrievable breakdown in the attorney-client relationship. The juvenile court granted the motion and later appointed mother new counsel.

¶ 11     Two months after new counsel was appointed, she alerted the court that she would be filing a "notice of ADA accommodations" because "it is abundantly clear that we are dealing with some disabilities." But she said there had not yet been a "specific evaluation." Mother completed her psychological evaluation six months later — one year after the treatment plan was adopted and one week before the originally scheduled termination hearing.

¶ 12     After mother completed the first portion of the evaluation, her counsel filed a notice of ADA applicability, which she later

supplemented with a motion for ADA accommodations. The court continued the termination hearing and "incorporate[d]" mother's request for accommodations into that hearing because mother was "continuing to collect information to support the recommendations."

## B. Applicable Law

¶ 13    When a parent has a qualifying disability under the ADA, a department "must account for and, if possible, make reasonable accommodations for the parent's disability when devising a treatment plan and providing rehabilitative services." *People in Interest of S.K.*, 2019 COA 36, ¶ 34; *see also* § 19-3-208(2)(g), C.R.S. 2025 (requiring a department's services to comply with the ADA).

¶ 14    But even when the ADA applies, the "paramount concern must remain the child's health and safety." *S.K.*, ¶ 36. Thus, the ADA does not restrict the juvenile court's authority to terminate parental rights when the parent, even due to a disability, is not able to meet the child's needs. *People in Interest of C.Z.*, 2015 COA 87, ¶ 17.

¶ 15    Moreover, a department can only provide reasonable accommodations for disabilities it knows about, either because the disability is obvious or because someone has informed the department of the disability. *S.K.*, ¶ 22. The parent is therefore

responsible for timely disclosing information regarding the disability and identifying any necessary modifications. *Id.* at ¶ 21; *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 16. The failure to do so impedes the department's ability to provide reasonable accommodations and undermines the parent's argument that any requested accommodation was reasonable. *S.Z.S.*, ¶¶ 16-17. Whether a parent is a qualified individual with a disability under the ADA is a case-by-case determination by the juvenile court. *S.K.*, ¶ 21.

## C. Analysis

¶ 16 The juvenile court determined that the Department made reasonable accommodations for mother's disabilities. And although the court found that only her physical disabilities were known to the Department, it did not consider only the accommodations for those physical disabilities. To the contrary, the court found that the Department "worked to identify appropriate ADA compliant resources," referred mother for a psychological evaluation to identify any mental health concerns, connected mother with a life skills worker to assist with medical care and public benefits, and offered assistance to mother's legal team in identifying resources.

¶ 17    The record supports the juvenile court's findings that the Department provided reasonable accommodations.  Specifically, the record shows that, among other things, the Department (1) explored ADA-compliant substance use treatment facilities; (2) discussed specific accommodations with one such facility; (3) sought resources for a parent with a TBI; (4) approved mother's request to engage in intensive outpatient therapy, instead of the recommended inpatient treatment, because of the barriers she faced; (5) connected mother with a mentor through the youth advocacy program (YAP); and (6) referred mother for life skills assistance through a facility experienced in helping individuals with developmental delays.

¶ 18    Mother asserts that the Department failed to make reasonable efforts to accommodate her disabilities in four ways: (1) delaying and failing to prioritize her psychological evaluation; (2) failing to locate, and refer her to, substance use treatment providers that could accommodate her disabilities; (3) failing to inform service providers about her "mental limitations"; and (4) failing to provide her with the services recommended by her psychological evaluation. Each of these contentions is belied by the record.

¶ 19     First, mother correctly points out that the Department expressed a preference for her to "have some sobriety under her belt" before completing her psychological evaluation.  But regardless of this preference, the caseworker asked mother to complete the evaluation about two months into the case, and mother "absolutely refused."  She then did not complete the evaluation for more than a year.  Thus, any delay in completing the evaluation was not due to a lack of effort by the Department.

¶ 20     Second, the record reflects that the caseworkers discussed mother's diagnoses with the Department's service navigator to identify appropriate facilities; provided mother's legal team with a list of ADA-compliant facilities, including one facility that specifically dealt with high-needs individuals; communicated mother's treatment recommendations to her legal team; and collaborated with mother's legal team about mother's treatment.

¶ 21     Because mother's legal team often referred mother to treatment facilities directly without notifying the Department — and did not provide signed releases — the Department was not always able to submit treatment referrals or communicate with the facilities regarding reasonable accommodations for mother's

disabilities. Indeed, the first caseworker testified that mother's legal team did not *want* treatment referrals from the Department and was providing the treatment facilities with information regarding mother's disabilities. Even so, the Department confirmed that mother's legal team communicated her requested accommodations to at least one treatment facility and advocated for mother when multiple facilities considered discharging her for noncompliance.

¶ 22 Third, although the Department did not provide mother with all the accommodations recommended by her psychological evaluation — including referrals for "a brain injury waiver program" to receive at-home assistance, a trauma-informed therapist, and resources for "fatigue management" — mother's motion for ADA accommodations did not request such accommodations. *See S.K.*, ¶ 21. Moreover, the caseworkers encouraged mother to establish mental health services, noted that providers at some of the treatment facilities she attended had trauma-focused training, and began assisting her with the process of obtaining a medical waiver.

¶ 23    Thus, because the record supports the juvenile court's findings and conclusion that the Department made reasonable accommodations for mother's disabilities, we discern no error.[1]

## IV.    Ineffective Assistance of Counsel — Mother

¶ 24    Mother also argues that she received ineffective assistance of counsel in connection with ADA accommodations.  She contends that her first counsel provided ineffective assistance by failing to (1) advise her about the ADA; (2) investigate her disabilities; and (3) request reasonable accommodations.  And she asserts that her second counsel provided ineffective assistance by failing to (1) promptly request reasonable accommodations and (2) "effectively prepare for the hearing on the motion for ADA accommodations."

## A.    Applicable Law

¶ 25    A parent has a statutory right to effective counsel in a dependency or neglect proceeding.  §§ 19-1-105(2), 19-3-202(1),

---

[1] To the extent mother asserts that the juvenile court erred by not making "specific findings of fact and law" under section 24-34-805(2)(f), C.R.S. 2025, as to why reasonable accommodations could not have prevented the termination, her reliance on that statute is misplaced.  Section 24-34-805(2)(f) applies only to cases "brought pursuant to title 14, a minor guardianship proceeding pursuant to title 15, or articles 4 and 5 of title 19."  Dependency and neglect proceedings are brought under article 3 of title 19.

C.R.S. 2025; *A.R. v. D.R.*, 2020 CO 10, ¶ 47. A parent can raise a claim of ineffective assistance of counsel for the first time on appeal. *People in Interest of C.H.*, 166 P.3d 288, 291 (Colo. App. 2007).

¶ 26 To establish a claim of ineffective assistance of counsel, a parent must show that (1) "counsel's performance was outside the wide range of professionally competent assistance," and (2) "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *A.R.*, ¶¶ 48, 60. If the parent fails to establish either prong of this test, the claim fails. *People in Interest of C.B.*, 2019 COA 168, ¶ 26.

¶ 27 If the parent's allegations are "sufficiently specific to constitute a prima facie showing of ineffective assistance of counsel," we must remand the case for further factual findings. *A.R.*, ¶ 63. But if the allegations lack sufficient specificity to support an ineffective assistance of counsel claim, we may summarily deny the claim. *Id.*

### B. Analysis

¶ 28 Assuming, without deciding, that mother's counsels' performance fell below the range of professionally competent assistance, mother has not shown that she was prejudiced by the alleged errors. Specifically, mother's allegations do not make a

11

prima facie showing that, but for her counsels' failure to timely raise the ADA or request accommodations, the result of the termination hearing would have been different.  *See A.R.*, ¶ 60.

¶ 29 Mother asserts that she was prejudiced because (1) the juvenile court relied on her counsels' mistakes — such as failing to include the Department in communications with service providers and failing to provide the Department with various reports of mother's disabilities and necessary accommodations — when concluding that some of mother's disabilities were unknown to the Department; and (2) if her counsels had timely advocated for appropriate accommodations, mother "would have received the appropriate reasonable accommodations for her disabilities."

¶ 30 We have already rejected mother's claim that the Department failed to provide her with reasonable accommodations, so she cannot establish prejudice on the basis that such accommodations were not provided.  But more to the point, the juvenile court concluded that mother was unfit and unlikely to become fit within a reasonable time due to her ongoing struggle in maintaining sobriety outside of a controlled environment.  Indeed, the record reflects that mother entered five inpatient treatment facilities and was

unsuccessfully discharged from all but one. Mother does not explain how any additional accommodations would have allowed her to overcome the substance use that made her unfit.

¶ 31 Mother impliedly asserts that because she successfully completed treatment at a facility experienced in helping individuals with TBIs, she would have successfully achieved sobriety if the other treatment facilities had likewise accommodated her disabilities. But mother does not explain what accommodations she needed from the other treatment facilities or how those accommodations would have rendered her fit in a reasonable period of time. Nor does she explain how successful completion of treatment at another facility would have rendered her fit, given that she did complete treatment at one and still remained unfit.

¶ 32 We therefore conclude that mother has not made a prima facie showing of ineffective assistance of counsel. *See A.R.*, ¶ 63.

### V. Treatment Plan Compliance — Father

¶ 33 Father contends that the juvenile court erred by finding that he did not comply with his treatment plan. We disagree.

¶ 34 Absolute compliance with every provision of a treatment plan is not required. *People in Interest of K.B.*, 2016 COA 21, ¶ 26. But

13

partial — or even substantial — compliance may not be sufficient to render the parent fit. *Id.* It is a parent's responsibility to ensure compliance with, and success of, the treatment plan. *Id.* at ¶ 25.

¶ 35 Father's treatment plan required him to, among other things, complete a substance use evaluation and follow all recommendations, abstain from using illicit substances, complete drug tests as requested by the Department, attend all scheduled family time, and refrain from further criminal activity.

¶ 36 In finding that father did not comply with his treatment plan, the juvenile court found that he inconsistently engaged in family time and struggled to maintain sobriety outside of a controlled environment. The court acknowledged that father successfully completed substance use treatment at an inpatient facility and that, when he attended family time, he was engaged and bonded with the child. But despite these successes, the court found that father had not shown *consistent* sobriety or family time attendance.

¶ 37 The record supports the court's findings. The first caseworker testified that there were "significant periods" during the case when father did not engage in family time. And when she transferred the case to the second caseworker approximately three months before

the termination hearing, she still had concerns about father's inconsistent family time engagement. The second caseworker testified that, in her four months on the case, father had attended only one month of family time and, at the time of the termination hearing, father had not seen the child in more than a month.

¶ 38 The first caseworker also described father's history of substance use treatment — including his unsuccessful discharges from two treatment facilities and lack of signed releases, which impeded the Department's ability to confirm his engagement at other facilities. When the first caseworker transferred the case, father was still struggling with substance use. The second caseworker opined that because of father's limited engagement in providing the necessary releases to confirm his substance use treatment and continued concerns regarding father's substance use, he had not completed that component of his treatment plan.

¶ 39 Father asserts that the juvenile court erred by finding that he did not comply with his treatment plan because he complied with aspects of the plan, including by (1) demonstrating periods of sobriety and being forthcoming about his substance use; (2) consistently attending family time overall; and (3) complying

15

with his criminal treatment objective.  Although the record supports many of father's assertions, the court considered this evidence, weighed it against the contrary evidence described above, and found that father had not sufficiently complied with his treatment plan.

¶ 40    Father effectively asks us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do.  *See S.Z.S.,* ¶ 29.  Rather, because there is record support for the juvenile court's finding, we discern no error.  *See id.*

## VI.    Fitness — Father

¶ 41    For similar reasons, we also reject father's contention that the juvenile court erred by finding that he was unfit and unlikely to become fit within a reasonable period of time.

### A.    Applicable Law

¶ 42    A parent is unfit if their conduct or condition renders them unable or unwilling to give their child reasonable parental care. *People in Interest of D.P.,* 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs and conditions. *People in Interest of A.J.,* 143 P.3d 1143, 1152 (Colo. App. 2006).  A

16

parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 43    When determining whether a parent's conduct or condition is likely to change within a reasonable time, the juvenile court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *S.Z.S.*, ¶ 24. What constitutes a reasonable time is fact specific and based on the physical, mental, and emotional conditions and needs of the child. *Id.* at ¶ 25. But a "reasonable time" is not an indefinite time. *Id.* And even when a parent has made progress on a treatment plan, the court need not give the parent additional time to become fit. *See id.* at ¶¶ 24-25.

¶ 44    In determining whether a parent is unfit, the court must consider whether the department has made reasonable efforts to rehabilitate the parent. §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2025. Reasonable efforts means "the exercise of diligence and care . . . for children and youth who are in . . . out-of-home placement."

§ 19-1-103(114), C.R.S. 2025.  This standard is satisfied by the provision of services in accordance with section 19-3-208.

¶ 45    In assessing whether a department made reasonable efforts, the juvenile court should consider whether the services provided were "appropriate to support the parent's treatment plan."  *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011).  But it is the parent who is ultimately responsible for using those services to obtain the assistance needed to comply with the plan.  *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

## B.    Analysis

¶ 46    Relying primarily on the same arguments he makes regarding his treatment plan compliance, father asserts that the court erred by finding he was unfit and unlikely to become fit within a reasonable time because he "demonstrated that he made a change and a commitment to meeting [the child's] needs."

¶ 47    But the court expressly recognized father's progress, noting that family time "went well" when father attended and that father successfully completed an inpatient substance use treatment program.  It nevertheless found that, despite this progress, father remained unfit and was unlikely to become fit within a reasonable

18

period of time. In so finding, the court reasoned that father's inconsistent family time and ongoing struggle with sobriety rendered him unable to give the child reasonable parental care.

¶ 48 Again, the record supports the court's findings. The second caseworker testified that, at the time of the termination hearing, she had not received confirmation that father had completed his substance use treatment, father had not engaged in family time for more than a month, and father had not demonstrated the ability to be a full-time parent to the child. She opined that, particularly in light of the ongoing concerns about father's substance use, he was unfit and unlikely to become fit within a reasonable time.

¶ 49 Father asserts that, to the extent he was unfit or unlikely to become fit, it was because the Department failed to make reasonable efforts. He points to the Department's failure to (1) "provide consistent, proper services," such as referrals to substance use treatment and continued YAP services; (2) obtain his signature on necessary releases by providing him with paper copies; and (3) expand his family time. We are not persuaded.

¶ 50 The juvenile court concluded that the Department made reasonable efforts to rehabilitate father but that the efforts were

"unsuccessful through no fault of the Department." Although the juvenile court's findings in this respect were not detailed, they did not need to be. *See A.S.L.,* ¶ 15 ("Failure of the court to make express findings, on its own, does not establish a failure by the court to ensure that the Department made reasonable efforts.").

¶ 51 And the record supports the juvenile court's conclusion. In particular, the record indicates that the caseworkers strove to engage father, promptly submitted referrals for family time and a substance use evaluation, discussed any needed releases with father, requested continued services by father's YAP mentor (which were denied due to lack of funding and father's lack of progress), communicated with various treatment providers and family time coaches regarding father's engagement and progress, and met with father to discuss any struggles or barriers that he faced.

¶ 52 Father points out that his family time did not increase in length or decrease in supervision level during the case. But there was no recommendation to do so, and the second caseworker expressed concern that father's inconsistent attendance could harm the child. *See People in Interest of B.C.,* 122 P.3d 1067, 1070 (Colo. App. 2005) (explaining that child's health and safety are paramount

when determining what family time services are necessary and appropriate).  And although father contends that the caseworker failed to submit treatment referrals for him, the record reflects that father often entered treatment before notifying the Department of his enrollment.  Father does not explain how his overall engagement in substance use treatment would have been different if the caseworker had directly submitted the treatment referrals.

¶ 53    Thus, because the record supports the juvenile court's determinations that, despite the Department's reasonable efforts to rehabilitate father, father was unfit and unlikely to become fit within a reasonable period of time, the juvenile court did not err.

## VII.   Less Drastic Alternatives — Father

¶ 54    Father finally contends that the juvenile court erred by finding that there were no less drastic alternatives to termination of his parental rights.  He proposes two such alternatives: (1) an allocation of parental responsibilities (APR) to the child's kinship placement and (2) denial of the motion to terminate mother's parental rights and an APR to mother.  We again discern no error.

## A. Applicable Law and Standard of Review

¶ 55 Before terminating parental rights, the juvenile court must consider and eliminate less drastic alternatives. *A.M.*, ¶ 19. In doing so, the court must "give primary consideration to the child's physical, mental, and emotional needs." *Id.* at ¶ 20. The court may consider, among other things, (1) whether an ongoing relationship with the parent would be beneficial or detrimental to the child, *see People in Interest of L.M.*, 2018 COA 57M, ¶ 29; (2) whether the child is bonded with the parent, *see People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009); and (3) whether an APR provides adequate permanence and stability for the child, *see People in Interest of T.E.M.*, 124 P.3d 905, 910-11 (Colo. App. 2005).

¶ 56 A less drastic alternative is not viable simply because it is "adequate"; it must be in the child's best interests. *A.M.*, ¶ 27. Thus, when the statutory criteria for termination are satisfied and the juvenile court considers a less drastic alternative but finds that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32.

¶ 57 We review the juvenile court's less drastic alternatives findings for clear error. *People in Interest of E.W.*, 2022 COA 12, ¶ 34, *aff'd*

22

*sub nom., R.W. v. People in Interest of E.W.*, 2022 CO 51. We must therefore affirm the juvenile court's decision if its findings have record support. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Analysis

¶ 58 The juvenile court expressly noted that it had considered less drastic alternatives but found, with record support, that termination was in the child's best interests because he needed the permanency of adoption. *See J.C.R.*, 259 P.3d at 1285 ("Permanent placement is not a viable less drastic alternative to termination if the children need a stable, permanent home that can only be assured by adoption.").

¶ 59 The first caseworker testified that the child "deserve[d] the permanency that only adoption [could] provide." And the second caseworker explained that the child's placement providers preferred termination. *See People in Interest of Z.M.*, 2020 COA 3M, ¶ 31 (noting that court may consider placement provider's preference for adoption over APR). Both caseworkers opined that no less drastic alternative to termination was in the child's best interests.

¶ 60 Father contends that an APR to the kinship placement was a less drastic alternative that was in the child's best interests because

(1) the child had a bond with father; (2) preserving the child's relationship with father was in the child's best interests; and (3) the child "had no immediate *need* for the permanency of adoption." But the child's bond with a parent and the benefit to the child of maintaining a relationship with the parent are just two factors, among many, for the court to consider when analyzing whether any less drastic alternatives are in the child's best interests. *See People in Interest of A.R.*, 2012 COA 195M, ¶ 38. And the court found that, considering all relevant factors, termination was in the child's best interests, notwithstanding the child's relationship with father.

¶ 61 Father also asserts that the court erroneously believed that the child needed to be placed in a permanent home within one year. *See* Ch. 237, sec. 3, § 19-3-703, 2019 Colo. Sess. Laws 2355 (repealing section 19-3-703, C.R.S. 2018, which required children under six years of age at the time a petition was filed to be "placed in a permanent home no later than twelve months after the original placement out of the home"). And it is true that the court erroneously cited the old one-year deadline in its oral ruling. But in its written order, the court correctly cited section 19-1-102(1.6), C.R.S. 2025, which requires children under six years of age to be

"placed in permanent homes as expeditiously as possible." *See People in Interest of O.J.S.*, 844 P.2d 1230, 1233 (Colo. App. 1992) ("[T]he court has the authority to supplement and modify the opinions it expressed in its oral remarks until the date judgment formally enters."), *aff'd sub nom.*, *D.A.S. v. People*, 863 P.2d 291 (Colo. 1993). Moreover, even if the juvenile court erred by relying on the repealed expedited permanency planning timeline, the child had been in out-of-home placement for nearly two years, and the court found that termination was in his best interests for reasons other than just the duration of such placement. *See People in Interest of C.C.*, 2022 COA 81, ¶ 20 (explaining that an error is harmless if it does not affect the party's substantial rights).

¶ 62    Finally, to the extent father asserts that the juvenile court should have denied the motion to terminate mother's parental rights and ordered an APR to mother, he lacks standing to challenge the termination of mother's parental rights. *See People in Interest of J.A.S.*, 160 P.3d 257, 261 (Colo. App. 2007). And "[t]o the extent [father] is deemed to have standing by virtue of [his] own interest in having the child[] placed with [mother] as a less drastic alternative to termination," there is no error for the reasons above.

*Id.* The juvenile court found that mother was unfit based on her inconsistent engagement in substance use treatment and lack of compliance with her treatment plan. *See D.P.*, 181 P.3d at 408. Because the record supports that finding and the juvenile court's termination of mother's parental rights, it necessarily follows that an APR to mother was not a viable less drastic alternative.

¶ 63 Thus, because the juvenile court's finding that there was no less drastic alternative to termination is supported by the record, we may not disturb that decision. *See B.H.*, ¶ 80.

## VIII. Disposition

¶ 64 The judgment is affirmed.

JUDGE WELLING and JUDGE LUM concur.